**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

RINGNECK, INC.,

    Plaintiff,

vs.                                          Case No. 3:08-cv-261-J-32JRK

JAMES R. BUCK,

    Defendant.

_____

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Ringneck, Inc. ("Ringneck") brought suit against defendant James R. Buck seeking judgment on Buck's personal guaranty of a promissory note. This Court previously determined that, pursuant to the express terms of the guaranty, Buck had waived any and all defenses to its enforcement other than the affirmative defense of payment in full. See Doc. 67. Because Buck raised genuine issues of material fact as to payment, the Court denied Ringneck's motion for summary judgment as to that issue. Id. The case therefore was tried to the Court[1] on July 13, 2010. The parties thereafter submitted proposed findings of fact and conclusions of law (Docs. 123, 124), and after consideration of the record, this case is ready for decision pursuant to Rule 52(a), Federal Rules of Civil Procedure.

---

[1] Buck initially demanded a jury trial, but withdrew this request during the Final Pretrial Conference (Doc. 79). Pursuant to Fed. R. Civ. P. 38(d), both parties then orally consented to a bench trial before the undersigned.

**I.    THE EVIDENCE**[2]

**A.    Background**

ITN/Grate Pallet, Inc. (formerly known as Innovative Technical Network Corporation) ("ITN") is a now-defunct Florida corporation whose primary business purpose was the manufacture and marketing of grate metal pallets, a product for which Buck had obtained method and design patents.  In 2000, Buck, in need of capital to fund ITN's operations, met Charles Hoffman, who was interested in investing in the company; Hoffman subsequently introduced Buck to Willis M. Ball III, and Ball introduced Buck to Larry C. Williams.  Hoffman, Ball, and Williams agreed to loan ITN $500,000, which was ultimately converted from debt into a fifty (50) percent equity interest in ITN.  Beginning in 2001, Buck served as either President, CEO, or chairman of ITN, with the remaining investors more passively involved in the company.

On November 13, 2003, ITN borrowed $2,300,175.00 from Columbus Bank & Trust ("CB&T").  The loan was secured by a promissory note (the "Note"), a perfected security interest in all ITN assets (including the patents), and the personal guaranties of Buck (who guarantied 100% of the loan), Hoffman (whose exposure was limited to $500,000),[3] Ball (100%), and Williams (limited to 40%).[4]  The Note obligated ITN to pay CB&T the principal

---

[2]    Where not otherwise indicated, the facts are undisputed.

[3]    Ringneck initially named Hoffman as a defendant in this case, seeking to enforce his $500,000 guaranty.  See Doc. 1 ¶ 15.  On November 5, 2008, the Court entered a consent judgment in favor of Ringneck and against Hoffman for that amount.  See Doc. 19.

[4]    Doc. 119, P. Ex. 1, T&A 24, 33, 41, 50, 67.  ITN's original indebtedness to CB&T began with the opening of a line of credit in 2001, which was guarantied by the same

sum of $2,300,175.00 on November 13, 2004.[5]

In late 2003, Williams assumed a more active role overseeing the sales and cash flow requirements of ITN. Deeming the sales numbers disappointing, Williams became increasingly critical of Buck's administration of the company and hired a crisis manager to replace Buck as CEO. A power struggle then emerged between Buck and the remaining investors, and in June 2004, Buck was removed from management entirely and Williams became sole director of ITN through an action of the shareholders. Around this time, Buck contended that he, not ITN, owned the patents upon which the company's success was thought to depend. To ensure the continued viability of the company, an agreement was reached whereby Buck would license the patents to ITN.

Williams reviewed ITN's financial statements in mid-June of 2004 and determined that the company was insolvent. On July 7, 2004, ITN filed a petition for Assignment for the Benefit of Creditors under Chapter 727, Florida Statutes, which transferred all of the company's assets to an assignee. Williams and Ball then formed Pallet Systems of America,

---

four individuals. The initial line of credit was eventually converted into a term loan, a line of credit loan, and a credit card facility (collectively, the "ITN indebtedness"). The line of credit loan (which constituted the great majority of the ITN indebtedness) was initially executed on May 1, 2001, then renewed on May 1, 2002, May 1, 2003, and November 13, 2003. Each time the loan was renewed, fresh guaranties were executed. In this action, Ringneck seeks to enforce only Buck's guaranty of the November 13, 2003 Note securing the line of credit loan.

[5]     In the Note, CB&T is identified as the lender; the operative term "you" is defined as "the lender, its successors or assigns." The Note obligates ITN to pay the aforementioned amount "to you, or your order." P. Ex. 1, T&A 24. This is commonly referred to as "order paper."

LLC ("PSA"),[6] which purchased the assets of ITN from the assignee subject to the ITN indebtedness.[7]  Buck litigated against the sale of ITN's assets to PSA without success; he also unsuccessfully appealed a court order approving the sale.

ITN's assignment petition triggered a default under the Note, causing CB&T to send default notices to the four guarantors.  Williams and Ball, who faced exposure to the Note both under their original guaranties and as the principals of PSA, entered into discussions with CB&T about how to address the ITN indebtedness.  On December 22, 2004, PSA applied for and received a new loan from CB&T in the amount of $2,748,804.04 (the "PSA loan"), the exact amount of principal and interest due under the ITN indebtedness.  The "Purpose" section of the note memorializing the PSA loan defined the loan's purpose as "RENEW/COMBINE PAYOFF."[8]  The PSA loan was secured by new guaranties executed by Ball (100%) and Williams (40%).  Whether the proceeds of the PSA loan were used to *pay off* the preexisting ITN indebtedness, as Buck contends, or to *purchase* the indebtedness for the purpose of preserving the original guaranties and the security interest in ITN's assets (including the patents), as Ringneck contends, forms the basis of the dispute

---

[6]  PSA is owned and controlled by Williams and Ball, who intended to operate PSA so as to exploit the patents through the aforementioned license agreement.

[7]  The Order Approving Sale of All Assigned Property and of Turnover of Sale Proceeds stated: "Purchaser [PSA] shall take the Property [of ITN] subject to the liens of Columbus Bank and Trust and Toyota Motor Corporation and shall, prior to any closing of the Transfer, execute documentation confirming Purchaser's obligation to pay amounts owed by ITN to Columbus Bank."  Doc. 120, D. Ex. 28, ¶ 5.  Pursuant to the Order, Ball (in his capacity as a PSA officer) executed a "Confirmation of Obligation to Pay" on September 14, 2004.  Doc. 120, D. Ex. 29C.

[8]  Doc. 120, D. Ex. 35.

4

in this case.

### A.     Ringneck and the Transfer and Assignment

The Court heard testimony from Howell Hollis III, an Atlanta-based attorney. Hollis testified that in the aftermath of the ITN assignment proceeding, he was engaged by Williams and Ball to address the ITN indebtedness. According to Hollis, Buck's litigiousness during the assignment proceeding created a difficult business situation for Williams and Ball, who felt that an adversarial relationship between PSA and Buck – the putative holder of the company's intellectual property, as well as a co-guarantor of its debt – would chill investment interest in PSA. Hollis testified that Williams and Ball ultimately determined that PSA's debt should be freed from any entanglement with Buck, and likewise that any association between PSA and ITN should be eliminated. At that time, Hollis cautioned Williams and Ball that if they (or PSA) were to simply pay off the ITN indebtedness, both the associated personal guaranties and the security interest in the patents would be extinguished. Preserving the lien on the patents was "very, very important," according to Hollis, because they were considered valuable at that time and the owner of the security interest could, in the event of a default, foreclose on that interest and become the owner of the patents.[9]

---

[9]     Doc. 116, Trial Tr. July 13, 2010, Howell Hollis III, pp. 25-31. At trial, Mr. Buck sought to introduce two letters from Mr. Hollis: one addressed to Mr. Williams, dated July 21, 2004 (Doc. 120, D. Ex. 23C), and one addressed to Mr. Williams and Mr. Ball, dated September 12, 2006 (Doc. 120, D. Ex. 49B). Ringneck contended that the letters were inadvertently produced privileged material, and filed a Motion in Limine seeking their exclusion. (Doc. 73). Mr. Buck filed a Motion in Limine seeking to include the letters, claiming that the privilege had been waived by Ringneck's treatment of the letters during discovery. (Doc. 70). The Court assumes without deciding that the privilege was waived as to the two letters, and thus considers their content; it should be noted that the great majority of that content was delivered in the form of testimony during trial by Mr. Hollis himself. In

The Court also heard the testimony of Ball and Williams on this point. Ball verified that it was his understanding that paying off the ITN indebtedness would extinguish the guaranties and release the secured collateral, including the patents. It was his intent to avoid such a result, Ball testified, for two reasons. First, due to the uncertainty about Buck's claim to the patents, Ball felt that it was important to preserve CB&T's security interest in case a dispute arose. Second, Ball hoped to preserve Buck's guaranty as leverage against the exact scenario at issue in this case – a claim by Buck that the Note had been paid off and that Buck owed nothing as a result.[10]

Williams testified that in addition to preserving the guaranties and the security interest through the purchase of the ITN indebtedness, he was interested in isolating any potential litigation associated with Buck within a separate company so that any such activity would not interfere with the business of PSA (including the business of raising capital).[11] To that end, Williams and Ball asked Hollis to create Ringneck. Williams and Ball each testified that it was their intention, as principals of both PSA and Ringneck, that the proceeds of the PSA loan be used to purchase the ITN indebtedness and all its associated documentation and to transfer it from CB&T to Ringneck via a Transfer and Assignment Agreement.[12]

The Court received the testimony of CB&T vice president William Blanchard via

---

addition, Ringneck's motions to exclude certain of Buck's late-filed exhibits (Docs. 111, 112) are denied.

[10] Doc. 116, Trial Tr. July 13, 2010, Wills M. Ball III, pp. 182-83.

[11] Id. at Larry C. Williams, pp. 194-96.

[12] Id. at Wills M. Ball III, p. 183; Larry C. Williams, pp. 195-96.

deposition. In 2004, Blanchard was a junior lender involved with servicing the ITN indebtedness. Blanchard testified that in late 2004, subsequent to ITN's default, CB&T "agreed to sell and transfer the loan documents to Ringneck, LLC," and that the bank had enlisted its outside counsel at the time, Lee Champion, to assist with the transaction.[13]

Hollis stated that in early December of 2004, he contacted Champion to initiate discussions about purchasing the ITN indebtedness.[14] On December 9, 2004, Hollis sent Champion an email with the subject line "asset purchase," wherein Hollis asked Champion to "[p]lease call to discuss when you can." Attached to the email was a draft document entitled "Transfer and Assignment (Non-Recourse)" (the "T&A").[15] The T&A, which bears a draft stamp of 2:31 p.m. on December 9, 2004, identifies the relevant documents underlying the ITN indebtedness and identifies Ringneck, LLC[16] as the "Transferee," CB&T as the "Bank" and ITN as the "Debtor." PSA is not identified. Under the T&A, the Bank would "sell, transfer, convey, and assign unto the Transferee, all of its right, title, and interest in and

---

[13]  Court Ex. 1, pp. 11-16. Blanchard originally stated that CB&T had agreed to sell the ITN indebtedness to PSA, not Ringneck, but after refreshing his memory with his previous affidavit, he testified that Ringneck, not PSA, was the intended transferee. Id. at 15. In addition, Blanchard stated that it was CB&T's intent to allow Ringneck, as transferee, to have the same rights as the bank did with respect to those documents. Id. at 33.

[14]  Doc. 116, Trial Tr. July 13, 2010, Howell Hollis III, p. 31.

[15]  Doc. 119, P. Ex. 6. At trial, the Court reserved ruling on Buck's Motion in Limine to exclude the various drafts of the T&A Ringneck sought to introduce (Doc. 71). Because the Court finds the drafts admissible, Buck's motion is denied, and the Court considers their content.

[16]  Ringneck was originally incorporated as Ringneck, LLC; the entity was later converted to a corporation.

to" the ITN indebtedness and its original underlying documentation. The amount of consideration was left blank on this draft of the T&A, as were the loan balance and per diem interest figures for the three loans making up the ITN indebtedness. The effective date of the T&A was identified as December 10, 2004.[17]

The Court received Champion's testimony via deposition. Champion testified that he represented CB&T during the assignment proceeding and during the purchase and sale of the ITN indebtedness. Champion recalled being instructed by CB&T that the bank "intended to transfer and assign their loan documents to either Williams or Ball or whoever they designated." It was Champion's understanding that this designee was Ringneck, and that a transfer of the original loan documents would be made to Ringneck for the full amount owed under those documents. He acknowledged receipt of the draft T&A from Hollis on December 9 and testified that it was his intent to supply the loan balances and complete the T&A. However, he did not do so at the time.[18]

PSA received the proceeds of the PSA loan on December 22, 2004, and transferred the funds to CB&T the same day.[19] By letter dated December 22, 2004, Hollis wrote to Champion: "[l]et this confirm that the proceeds of the new loan to Pallet Systems of America will be used to purchase pursuant to the transfer and assignment agreement previously sent

---

[17] Doc. 119, P. Ex. 6; Doc. 116, Trial Tr. July 13, 2010, Howell Hollis III, p. 34.

[18] Court Ex. 2, pp. 19-20. Ringneck's motion to substitute an improperly attached exhibit to Champion's affidavit (Doc. 122) is granted, and the corrected exhibit will be included in the record.

[19] Id. at p. 21; Doc. 120, D. Ex. 35.


to you." In addition, Hollis advised Champion that he had yet to receive a copy of the executed T&A, and asked if it would be forthcoming once payment was confirmed.[20] On December 23, Hollis sent Champion two more draft versions of the T&A which incorporated minor changes.[21]

On December 29, Irene Cawthorne, a CB&T employee, contacted Ball by email and advised that an additional $26,513.48 was required to "pay the ITN note and close the [PSA] loan."[22] On December 31, Ball emailed Ron Spinelli, a PSA employee, with a copy to Williams, to advise that Cawthorne had contacted him again to request two additional days of interest, in the amount of $861.15, which was owed to CB&T because "the payoff info was based on a 12-20 transaction date while the actual date was 12-22."[23] Ball instructed that these two amounts be wired to CB&T, bringing the total amount paid for the ITN indebtedness to $2,776,178.67, plus a loan origination fee of $20,538.69.

According to Blanchard, the PSA loan funds and the additional interest payments, once received, were debited against the ITN indebtedness, taking the latter off CB&T's

---

[20]   Doc. 119, P. Ex. 11.

[21]   Doc. 119, P. Ex. 9, 10.

[22]   Doc. 120, D. Ex. 42A.

[23]   Doc. 120, D. Ex. 43.  When asked to explain his use of the word "payoff" in this email, Ball testified that "payoff is, in my mind, a commercial term which means a total principal amount plus an accrued interest amount, which might include a per diem amount as well, which would be required to know before a loan could be paid off or, for that matter, could be purchased. . ." He then reiterated: "[W]e didn't pay the loan off. . . We bought the loan. And so the term payoff, to me, was just a term used to indicate what the accrued principal and. . . accrued interest were." Doc. 116, Trial Tr. July 13, 2010, Willis M. Ball III, pp. 142-43.

books. Blanchard testified that the bank's computer system would not indicate whether an obligation had been sold or paid off, since the end result (satisfaction of CB&T's interest in the indebtedness) was the same to CB&T. Regarding the PSA loan's stated purpose of "RENEW/COMBINE PAYOFF,"[24] Blanchard testified that this notation was "reflective of an internal language for satisfying an obligation, but [that it] does not reflect accurately the intent of this note to purchase the [ITN indebtedness]." Blanchard reiterated that it was CB&T's intent to sell the ITN indebtedness and associated loan documents to Ringneck in accordance with the terms of the T&A, and that that was in fact what occurred.[25]

On the subject of accounting, the Court also heard the testimony of John Moyer, former contract accountant for ITN and PSA. Moyer testified that he had no direct knowledge of the purpose for the PSA loan other than the "RENEW/COMBINE PAYOFF" notation, though he assumed from this language that the ITN indebtedness had been refinanced.[26] Moyer was asked whether, if PSA had provided the funding for Ringneck's alleged purchase of the ITN indebtedness, there should have been a note receivable from Ringneck to PSA in 2005, the last year of Moyer's employment with the company. He responded: "If Pallet Systems of America paid $2.7 million *to Ringneck*, there should have

---

[24]  Doc. 120, D. Ex. 35.

[25]  Court Ex. 1, pp. 20-21, 25-26, 31-32.

[26]  Moyer also stated that, at some point in 2004, "Mr. Ball or Mr. Williams had stated that the three loans would be refinanced." He did not recall the date of this statement and did not specify to whom the statement was made, and conceded that he had no knowledge whether the ITN indebtedness was, in fact, refinanced. Doc. 116, Trial Tr. July 13, 2010, John R. Moyer, pp. 125-126.

been some type of a note receivable from Ringneck" (emphasis added).  However, on cross examination, Moyer conceded (I) that he had no knowledge that PSA paid any money to Ringneck, and that the accounting treatment of the transaction would not require a note receivable to Ringneck in a situation where the loan was purchased outright; (ii) that he had never heard of any intended transfer and assignment between CB&T and Ringneck; and (iii) that he had no knowledge of whether CB&T sold the documents evidencing the ITN indebtedness, or that such a transaction was even possible.[27]

Champion testified that once he confirmed that payment had been made for the ITN indebtedness, he instructed his secretary to overnight the original loan documents to Hollis. On January 10, 2005, Champion sent Hollis an email memorializing the contents of the overnight package, which included the Note and the original contents of CB&T's loan files. Thereafter, Champion's email stated: "The proceeds of the loan to Pallet Systems of America, LLC have been used to purchase the indebtedness of ITN/Grate Pallet per your instructions.  The Transfer and Assignment (Non-Recourse) is being completed and will be forwarded to you for approval shortly."[28] Hollis received these original documents, which had

---

[27]   Id. at pp. 111-12, 119-20, 122-24, 128-29.  In his testimony, Moyer stated that he was not aware that a bank note could be purchased and transferred and assigned. Specifically, he testified: "I didn't know you could purchase, say, the note itself. I thought that -- I've always kind of thought, even with my own dealings refinancing my house, if I refinance it with one bank, the note that the other bank -- went away and I had a new note. And that's how I've always looked at notes." Id. at 124.

[28]   Doc. 119, P. Ex. 14.

not been marked in any way to indicate that they had been "paid" or "satisfied."[29]  On January 13, 2005, Champion forwarded a revised T&A to Hollis for review. All of the blanks were complete, but the document was not executed.[30]

Hollis testified that sometime in late 2006, he consulted Ringneck's file and discovered that he did not have an executed copy of the T&A, though "he thought it had already been signed." However, because he could not locate an executed copy, he "set about to try to get it signed so I would have it." Hollis testified that he thereafter sent his last draft of the T&A to CB&T, where it was executed by Blanchard. The executed T&A bears an effective date of December 10, 2004.[31]

Blanchard authenticated his signature and testified that he recalled being presented with the document for signature sometime in 2006 or 2007. He stated: "I don't recall exactly how or why it ended up back to me, but it did. I was called and asked to – what I recall – basically memorialize what was completed in 2004." Blanchard testified that he was comfortable executing the T&A because he "felt that it was effective at dealing with the intent

---

[29]   In his affidavit (which was introduced into evidence at trial), Mr. Champion noted that when indebtedness is paid in full, it is customary to return the original loan documents to the obligor thereon, marked "satisfied" or "paid in full." Doc. 120, D. Ex. 79 at ¶ 24. In this case, he noted that he did not return the originals to the obligor, but rather to Ringneck, and they were never marked as "paid" or "satisfied." Id. at ¶ 25. In addition, Mr. Champion stated "[m]y instructions from the Bank were to deliver all Loan Documents to Ringneck, including the Guaranties of Buck and Hoffman . . . *It was my understanding that I was to transfer the loan documents for the purpose of giving the recipient [Ringneck] the right to enforce the instruments by their terms.*" Id. at ¶¶ 25, 27 (emphasis added).

[30]   Doc. 119, P. Ex. 15.

[31]   Doc. 119, P. Ex. 2; Doc. 116, Trial Tr. July 13, 2010, Howell Hollis III, pp. 48-49; Court Ex. 1, p. 32.

of the transaction in 2004," which was to allow the transferee, as identified in the T&A, to have the same rights as CB&T did as owner of the documents. Blanchard did not recall whether, in his discussions with Champion at the time of the 2004 transaction, Champion ever differentiated between Ringneck and PSA and that he did not recall the relationship between the two companies.[32]

## II.   THE LAW AND THE COURT'S DECISION

Under Georgia law,[33] "[a] plaintiff seeking to enforce a promissory note establishes a prima facie case by producing the note and showing that it was executed." Fielbon Development Co., LLC v. Colony Bank of Houston County, 660 S.E.2d 801, 805 (Ga. Ct. App. 2008). For a third party (i.e., Ringneck) to sustain an action on a note made payable to the order of another person or entity (i.e., CB&T), the third party must affirmatively show that the note has been delivered to it "for the purpose of giving to the person receiving delivery the right to enforce the instrument." OCGA § 11-3-203. Such delivery constitutes a transfer, which vests in the transferee any right of the transferor to enforce the instrument.

---

[32]   Court Ex. 1 pp. 31-33, 42-43. The Court also heard the testimony of Thomas Ryan Buck, Mr. Buck's son. The younger Mr. Buck testified that certain misrepresentations "and [ ] basically lies" had been made to him by Williams and Steve Danneman, who became CEO of PSA during 2005. Though the alleged misrepresentations are not altogether clear, the thrust of Buck's testimony was that PSA and Ringneck were alter egos of Williams and Ball, and that Williams had sent Buck several emails indicating that the ITN indebtedness was still owed, without indicating that it was Ringneck to whom the debt was owed. Doc. 116, Trial Tr. July 13, 2010, Thomas Ryan Buck, pp. 208-13.

[33]   The terms of the Note, Buck's guaranty, and the T&A dictate that Georgia law governs the Court's resolution of this matter. See, e.g., P. Ex. 1 at T&A 26 ("The law of the state of Georgia will govern this agreement."); Id. at T&A 42 ("This guaranty shall be governed by the state where the lender is located;" CB&T is located in Georgia).

Id. Once the record evidence shows that a promissory note is due, has been duly executed and that a plaintiff is a "person entitled to enforce" the note, a prima facie right to judgment as a matter of law is established and the burden shifts to the defendant to establish an affirmative defense. OGCA §§ 11-3-301, 11-3-308; see also Reece v. Chestatee State Bank, 579 S.E.2d 11, 14 (Ga. Ct. App. 2003).

At trial, Ringneck produced the Note and Buck's guaranty, both of which were executed by Buck. In addition, Ringneck established that CB&T intended to transfer the Note and Buck's guaranty to Ringneck for the purpose of giving Ringneck the authority to enforce both instruments.[34] Thus, the only remaining question is whether Buck has established that the Note was instead paid off with the proceeds of the PSA loan, thereby extinguishing Buck's liability on the guaranty.

The Court finds that Buck has not met his burden of proving the affirmative defense of payment. Though certain language in documents and correspondence (i.e., the notation of "RENEW/COMBINE PAYOFF" on the PSA loan; Ball's use of the word "payoff" in the email to Irene Cawthorne) raised questions of fact sufficient to avoid summary judgment, it is evident from a review of the full complement of evidence that PSA purchased the ITN indebtedness from CB&T, that the indebtedness was transferred to Ringneck, and that it remains unpaid.

---

[34] The record-keeping of both CB&T and Ringneck regarding the T&A agreement was shoddy, to be kind. Regardless, Ringneck established through uncontroverted testimony and documentary evidence that CB&T did, in fact, transfer the original loan documents to Ringneck for the purpose of giving Ringneck the authority to enforce them. See Doc. 120, D. Ex. 79 at ¶ 25, 27; Court Ex. 1, p. 33.

In so finding, the Court finds the testimony of Hollis, Ball and Williams credible. Each spoke to the initial intent behind this transaction – the desire to retain a perfected security interest in the patents upon which PSA's business depended, at a time when the company was emerging from the ashes of a heavily contested assignment proceeding with the rightful ownership of those patents in doubt.[35] Williams and Ball's ultimate goal was to right the ship and build PSA into a successful company, paying off both the ITN indebtedness and the PSA loan in the process.[36] When PSA's business did not recover and the patents were discovered to be worth significantly less than originally thought, Williams and Ball suffered heavy financial losses, which they sought to share with their original co-guarantor, Mr. Buck.[37] Both Williams and Ball recognize that, because Ringneck purchased the entirety of

---

[35] As stated by Williams: "in the disagreement period we executed a global settlement agreement [with Buck] that included a patent and license agreement. And rather than fighting over who owned the patent, we decided at that time to. . . agree that, Okay, we're not going to worry about who owns the patents, we'll just assign a patent license agreement, in which we paid royalty fees to Mr. Buck. . . but we wanted to keep a lien on those patents so that in the event that that relationship was unsatisfactory that we could protect our interest in those patents, because that was the fundamental premise under which we raised capital from investors." Doc. 116, Trial Tr. July 13, 2010, Larry C. Williams, pp. 196-97.

[36] On this point, Williams testified about the business decision to accumulate more debt after the assignment proceeding with the hope of turning a subsequent profit: "Mr. Ball and I were willing to jump back in the frying pan, so to speak, and try to operate these assets that had previously been operated by Mr. Buck, and see if we could do a better job, and, in that regard, attempt to generate the profits that would then in turn be used to retire the indebtedness." Id. at 197.

[37] As Williams noted, "Unfortunately PSA never made any money. As a matter of fact, it never made the money even to pay its overhead, much less its debts . . . [despite] the fact that either our investors or Mr. Ball or I put those dollars in. So at the end of the day, Mr. Ball and I are several million dollars poorer with not a lot to show for it, other than some recovery potentially from Mr. Hoffman and hopefully Mr. Buck in this proceeding." Id.

the documents evidencing the ITN indebtedness, their original guaranties are also still valid and enforceable.[38]

To effectuate their goal of operating a new company (PSA) which was free of any litigation issues related to Mr. Buck, Williams and Ball formed a new entity (Ringneck) and directed that the proceeds of a loan taken out in the name of PSA – but secured by their own personal guaranties – be used to buy the ITN indebtedness and transfer that "bundle of assets" – i.e., the Note, the guaranties, and the security interest in the patents – to Ringneck. The testimony and writings of all parties to the transaction, from CB&T (Blanchard) to Ringneck (Williams and Ball) to the attorneys involved (Hollis and Champion) demonstrates that this purchase and transfer did, in fact, occur. While the failure of Ringneck and Hollis to obtain an executed T&A agreement at the time of the transaction muddied the waters, given the other overwhelming evidence of the intent of CB&T and PSA to assign the ITN indebtedness to Ringneck, it ultimately is of no moment.[39] The evidence also demonstrates

---

[38]  As stated by Ball, "the way it was explained to me [at the time of the transaction] . . . [w]as that by purchasing the note and the collateral and the guaranties, we basically stood in the shoes of the bank. We were in the same position as the bank. No better, no worse. So it was my understanding that I, along with the other three guarantors had an obligation to pay that loan off, although it was no longer owed to the bank. It was now an obligation owed to Ringneck." Doc. 116, Trial Tr. July 13, 2010, Willis M. Ball III, p. 185. When asked whether it was their understanding that they still remain liable to Ringneck on their guaranties, both Williams and Ball answered in the affirmative. Id.; Id. at Larry C. Williams, pp. 197-98. Of course, as Ball and Williams own and control Ringneck, they did not name themselves as defendants in this action. Despite this, both Ball and Williams testified to their understanding that they remain subject to contribution actions regarding the ITN indebtedness, including a contribution action from Mr. Buck if a judgment is obtained against him. Id. at Larry C. Williams, p. 198; Willis M. Ball III, pp. 186-87.

[39]  While a fully executed T&A agreement would have been the best evidence of the parties' intent, Buck cites no Georgia law that requires a formal, signed agreement to

that Ringneck currently holds title to the Note and the guaranties, giving it the same authority as CB&T once had to enforce those documents against Buck.

Buck's contention that Ringneck is an improper alter ego of Williams and Ball does not change this result. Williams and Ball own both PSA and Ringneck. Had they so desired, Williams and Ball could have structured the transaction such that PSA, or even Williams or Ball themselves, purchased and held the ITN indebtedness directly. Further, the purchase could have been made with cash instead of utilizing the proceeds of the PSA loan. So long as the delivery of the loan documents evidencing the ITN indebtedness had the purpose of giving the ultimate recipient the right to enforce the instruments, the identity of the transferee has no effect on the enforceability of the Note or Buck's guaranty.

As it was, Williams and Ball borrowed the money through PSA and directed that it be used to purchase the ITN indebtedness to be held in Ringneck, so that Ringneck might one day enforce the operative instruments, as it seeks to do here.[40] Though there is undoubtedly bad blood between the parties – as is common in failed business ventures – the cold truth is that the Note has not been paid, Buck's guaranty is still valid, and Ringneck is entitled to enforce it.[41] Accordingly, it is hereby

---

effectuate a valid transfer and assignment of indebtedness, especially in a case such as this where the evidence of the parties' intent is essentially uncontroverted.

[40] The Court notes that the patents were ultimately foreclosed on and purchased at a credit sale by Ringneck. Thus, Ringneck has already successfully utilized the security agreement obtained from CB&T to assert its rights against the patents.

[41] To the extent that the Court has not ruled on any pending motions, they are **DENIED** as moot.

**ORDERED:**

Consistent with these Findings of Fact and Conclusions of Law, **no later than October 22, 2010,** Ringneck will submit proof of the amount due under the Note and Buck's guaranty, as well as a Proposed Final Judgment. No later than **November 15, 2010,** Mr. Buck may, if he chooses, file a response. Thereafter, the Court will proceed to the entry of Final Judgment.

**DONE AND ORDERED** at Jacksonville, Florida this 4th day of October, 2010.

*[signature]*
TIMOTHY J. CORRIGAN
United States District Judge

jmm.
Copies to:
Pro se party
Counsel of record